IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

```
CLARENCE HUNTER, et al.,      )
                              )
    Plaintiffs,                )
                              )       CIVIL ACTION NO.
    v.                         )      1:05cv1142-MHT
                              )            (WO)
ARMY FLEET SUPPORT,            )
et al.,                        )
                              )
    Defendants.                )
```

OPINION

Plaintiffs Clarence Hunter, Clarence A. Jones, and James Starks, who are African-American, brought this lawsuit against their current and past employers, Army Fleet Support, LLC and CSC Applied Technologies, LLC, claiming employment discrimination based on race in violation of Title VII (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a, 2000e to 2000e-17) and § 1981 (Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981).  The plaintiffs assert two claims:  (1) the defendants assigned more and harder work to the plaintiffs than they did to similarly situated white

employees; and (2) the defendants segregated its employees, including the plaintiffs, by assigning them to crews based on their race.  This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

This lawsuit is currently before the court on the defendants' two motions for summary judgment.  For the reasons that follow, the motions will denied as to the plaintiffs' work-assignment claim and granted as to their segregation claim.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in

favor of that party.   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II. FACTS

Fort Rucker, Alabama, is the primary flight-training base for U.S. Army Aviation; the Army hires outside contractors to provide maintenance of helicopters there. The plaintiffs work as Armament Aircraft Technicians at Fort Rucker, working first for CSC Applied from October 1, 1988, to November 30, 2003, and then for CSC Applied's successor, Army Fleet.  Their job duties included troubleshooting, cleaning, inspecting, and repairing the Army helicopters' weapons systems after trainings so that they could be used again.   These helicopters, colloquially called "birds," fall into two rough categories: "clean birds," in which no armament has been fired, and "dirty birds," where armament has been fired and has discharged gunpowder.  Working on dirty birds is

dirtier, more strenuous, and more tedious than working on clean birds.

The plaintiffs' shift included two crews, one composed of the three of them (the so-called black crew) and another composed of two or three white men (the so-called white crew). The plaintiffs claim that the black crew was given disproportionately more dirty birds to clean than was the white crew. The plaintiffs also claim unlawful racial segregation in the assignment of employees to crews.

## III. DISCUSSION

### A. Work-Assignment Claim

Title VII provides that it is "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2 (a)(1).

Section 1981 similarly prohibits race discrimination in employment. Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 372-373 (2004).  When, as in this case, the plaintiff offers circumstantial evidence to establish a disparate-treatment claim under Title VII or § 1981, the court assesses the sufficiency of the proffered evidence using the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to show discriminatory intent.  Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977); Williams v. Motorola, Inc., 303 F.3d 1284, 1293 (11th Cir. 2002).[1]

First, the plaintiff must establish a prima-facie case, which creates an inference of discrimination, Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998); next, the employer must produce a

---

1. This burden-shifting analysis, while most familiar in the Title VII arena, is also used for claims under § 1981.  Shields v. Fort James Corp., 305 F.3d 1280, 1282 (11th Cir. 2002); Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318 (11th Cir. 1998).

legitimate, nondiscriminatory reason for its actions; and, finally, the burden shifts back to the plaintiff to produce "sufficient evidence to find that the employer's asserted justification is false" and a pretext for unlawful intentional discrimination. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000).

Pursuant to the McDonnell Douglas framework, the court begins its discriminatory treatment analysis by determining whether the plaintiffs can establish a prima-facie case. A plaintiff may establish a prima-facie case by showing that he (1) is a member of a protected class; (2) suffered an adverse-employment action; and (3) was treated less favorably than a similarly situated individual not in the protected class. Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ., 342 F.3d 1281, 1289 (11th Cir. 2003); see also McDonnell Douglas Corp., 411 U.S. at 802. That the plaintiffs here satisfy the first element is not in dispute; it is the last two elements that are the crux of this lawsuit.

6

Under the governing standard for determining adverse-employment actions, an employee must show "a serious and material change in the terms, conditions, or privileges of employment.  Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001). Notably, while the Eleventh Circuit in Davis expressed caution about finding a work assignment to be an adverse-employment action, it explicitly does not "suggest that a change in work assignments can never by itself give rise to a Title VII claim; in unusual instances the change may be so substantial and material that it does indeed alter the terms, conditions, or privileges of employment." Id. at 1244-45.

Because cleaning dirty birds is among the job requirements of an Armament Aircraft Technician, the

court does not understand the plaintiffs to contend that the mere assignment of dirty birds to them constituted an adverse-employment action. In other words, the plaintiffs do not contend that no dirty birds should have been assigned to them. Rather, it is the allegedly disproportionately greater assignment of dirty birds to them (the so-called black crew) than to the other crew (the so-called white crew) that is at the heart of their work-assignment claim. With this argument, the plaintiffs essentially collapse into one element the second and third elements for establishing a prima-facie case: the assignment of dirty birds to them was adverse because dirty birds were assigned to their crew, the black crew, disproportionately more frequently than to the white crew.

The disproportionate assignment of dirty birds between crews could constitute an adverse-employment action, that is, it could qualify as one of Davis's "unusual circumstances." 245 F.3d at 1244-45. Dirty

8

birds take longer to work on than clean birds, with the result that a crew with an over-assignment of dirty birds could, if a crew's work hours corresponded with the amount of work to be done, have to work longer hours to receive the same pay as their peers, with arguably a decrease in that crew's per-hour earnings; indeed, according to the plaintiffs, the white crew often quit work sooner than they did because the white crew had fewer dirty birds (or none at all) to clean.  See Minor v. Centocor, Inc., 457 F.3d 632, 634 (7th Cir. 2006) (requiring employees to work longer hours for the same pay is "functionally the same as a ... reduction in [the plaintiff's] hourly pay, a material change by any standard").

After reviewing the evidentiary record, the court is convinced that the plaintiffs have created a triable issue of fact as to whether they were disproportionately assigned more dirty birds to clean than was the white crew.

9

B. Segregation Claim

The plaintiffs claim that they were assigned to and maintained, in violation of Title VII and § 1981, as an all-black crew because of their race.  The defendants first respond that, even if they intentionally created and maintained racially segregated crews, Title VII and § 1981 would not prohibit this conduct as long as the defendants otherwise did not racially discriminate against the plaintiffs in hiring, termination, and pay and in other tangible ways.  The court strongly disagrees with the defendants' essentially 'separate but equal is acceptable in the workplace' argument.

An employer's intentional creation and maintenance of racially segregated crews is just as invidious and offensive to the notions of equality at the heart of Title VII and § 1981 as would be segregated water fountains, one labeled for whites and the other labeled for blacks, or segregated rest rooms, one labeled for whites and one labeled for blacks.  Such intentional racial segregation in the workplace, even without loss of

tangible benefits, is invidious and offensive because it is inherently demeaning.  Cf. Brown v. Board of Education, 347 U.S. 483, 494 (1954) ("To separate [children in public schools] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community ....") (emphasis added); Parents Involved in Community Schools v. Seattle School Dist. No. 1, ___ U.S. ___, ___, 127 S.Ct. 2738, 2767 (2007) ("In Brown ..., we held that segregation deprived black children of equal educational opportunities regardless of whether school facilities and other tangible factors were equal, because government classification and separation on grounds of race themselves denoted inferiority.") (emphasis added).

In furtherance of this notion, Title VII provides that it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his ... conditions ... of employment, because of such individual's race," 42 U.S.C. § 2000e-2(a)(1);

the statute further provides that it is "an unlawful employment practice for an employer ... to ... segregate ... in any way which would ... adversely affect his status as an employee, because of such individual's race." § 2000e-2(a)(2).  The defendants' intentional racial segregation of the plaintiffs, if true, would "discriminate ... with respect to ... conditions ... of employment" and it would "segregate ... in a[] way which would ... adversely affect ... status as an employee," because such segregation would be inherently and greatly demeaning to the plaintiffs: indeed, with such conduct, the defendants would relegate the plaintiffs to second-class status in the workplace merely because of their race.

Nevertheless, as it ends up, the plaintiffs have failed to establish that the defendants did, indeed, intentionally maintain or establish racially segregated work crews.  The court therefore agrees with the defendants' other argument that the plaintiffs' claim

12

that they were subject to unlawful racial segregation is without merit on the facts as presented here. For a brief period, the plaintiffs' shift did indeed have one crew with two white men and one crew with three black men. As the plaintiffs themselves have shown, however, this composition plainly derives from a combination of non-discriminatory events and personal preference, and not from any segregationist intent on the part of the defendants or the shift's leadman, Paul Day. Indeed, historically, single-race crews appear to be the exception and not the rule.

Prior to the arrival of plaintiffs Starks and Jones on the third shift, plaintiff Hunter worked under Day in a crew with two white men, Rick McTarsney and Randy Hall. This crew thus began as mixed-race, but Hunter voluntarily removed himself from it to work alone. Pls.' Br. in Opp. to Summ. J. (Doc. No. 62), at 4. In January 2003, the first time that all three plaintiffs were working on the third shift, the shift had three new

13

workers, all of whom were black: Starks, Jones, and Tanya Cole-Harris.  See id.  These three new workers had to be assigned to the two existing crews.  Because all three new workers were black, the only way to avoid creating an all-black crew would have been to split up the pre-existing team of McTarsney and Hall.  Day presumably saw no need to do so, and he had no obligation under the law to go out of his way to force the creation of mixed-race crews.  In the final arrangement, one crew was composed of McTarsney, Hall, and Cole-Harris, and the three plaintiffs worked together on the other crew.  Id.

Two months later, Cole-Harris left her crew, turning her formerly mixed-race crew into an all-white crew.  Id. at 5.  At the same time, Hall left and was replaced by Merritt Carothers, another white man; at that point, with one one-man crew and the plaintiffs' three-man crew, it was only practical for Day to assign Carothers to work with McTarsney.  The creation of this all-white crew was thus a product of happenstance and not intentional

segregation.  Even during this period of two single-race crews, however, if McTarsney or Carothers were out, Jones would be assigned to work with the remaining crew member, creating a temporarily mixed-race crew.  Id.

***

For the above reasons, an appropriate order will be entered allowing the plaintiffs' work-assignment claim to go to trial and granting summary judgment in favor of the defendants on the plaintiffs' segregation claim.[2]

DONE, this the 21st day of December, 2007.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE

---

2.  CSC Applied also asserts that the plaintiffs, by failing to name it in their EEOC change, may not now bring a Title VII claim against it.  The court need not reach that argument at this time, however, as CSC Applied has shown no reason why the plaintiffs' § 1981 claim may not go forward.  If necessary, the court will address the particular issue of Title VII in future proceedings.